Good morning and may it please the court. My name is Al Simon and I'm here on behalf of the appellants, Bryan Stirling, the Director and Commissioner of the South Carolina Department of Corrections, and Joseph McFadden, who is the Warden of the Lieber Correctional Institution. Your Honors, this case is about deference. In federal habeas actions that are filed in cases involving state convictions, filed under 28 U.S.C. section 2254, when the claims raised in the federal habeas petition have been ruled upon on the merits by a state court, a federal court can only grant relief where there is no possibility that fair managers could disagree that the state court's decisions conflicts with United States Supreme Court precedent. Even a strong case for relief does not mean that a state court's contrary conclusion was unreasonable. In this case, the district court ignored its obligations to afford proper deference to the state court's factual findings as required under section 2254 D.2 and ultimately failed to afford proper deference to the state court's determinations that Mr. Bennett was not entitled to relief upon the claims that he was granted relief in federal habeas relief as required under 2254 D.1. As a result of these failures, the district court improperly granted federal habeas relief and requested this court reverse the district court's order. May I ask you just a quick question? And it goes to the statements and in particular the King Kong statement. I'm trying to figure out exactly what holding from a state court is entitled to epidefference on King Kong. Because you say in your brief I think that the Supreme Court of South Carolina reasonably found that there was no fundamentally unfair trial. But all I see in the Supreme Court decision is sort of a factual finding that the King Kong reference was not actually an invocation of race. So I'm trying to get a handle on what I defer to on King Kong. In the signing of the King Kong issue, it is our contention that our Supreme Court did determine that it did make the factual determination that that wasn't a reference to race. But it also further found that that comment along with the other comments, I believe it also referenced a comment about cavemen, did not inject, did not run his trial unfair. Yeah, I don't see that. Can you, I mean I'm just looking at it and it says that the use of King Kong was not an appeal to the passions of prejudices or prejudices of the jury. And then at the end though it's based on the above reasoning, the solicitor's comments did not improperly inject racial issues into the trial. So I'm just going to figure out exactly what I should be deferring to. And I guess that's the language that we're referring to as a decision by the South Carolina Supreme Court on the legal determination that it did not infect the trial with with unfairness. Okay, so you think when they say did not improperly inject racial issues into the trial at all, we can read that more generally to mean and if they did it wasn't a due process violation because there was no prejudice? Correct. Okay. First, the district court erred in finding that Bennett was entitled to federal habeas relief upon his claim that he did not receive a fair trial by a fair and impartial jury because there was a biased juror on the panel. In granting relief upon this claim, the district court failed to afford the findings and inferences contained in the order by the state PCR court were supported by the state court record. First, the issue that the district court where we believe it made its error was finding that the PCR court's determination... How else could the King Kong statement be interpreted other than as a racially tinged statement? In regards to the King Kong statement, we believe that as our Supreme Court found, what it was referring to was the fact that Mr. Bennett, who was 6'5", 6'6", 300 pounds, he was much greater in size than the victim in the case. Well, if that's the case, why didn't you use the same language the first time before the particular comment for an all-white jury? Well, we disagree, Your Honor, on that he was saving this kind of... Was that comment made earlier? It wasn't made in the first trial, but this trial was tried completely differently from how the first trial was tried. In this case, it was a resentencing hearing. In the first case, they approached several different issues differently. And that's just... that was just a matter of how the prosecutor decided he wanted to change his approach. It had nothing to do with the race of the jury. In fact, we believe that the contention that this was... He changed his strategy. What prompted the change in approach? It was the same defendant being resentenced. There was a five-year time period between the first trial and the second trial, new information that came about. And looking at the testimony that was presented during the State's case, it appears, from looking at that testimony, that they were focusing very much on Mr. Bennett's brutality against those that are smaller than him. There is more detail that was put in this record regarding the injuries of the victims from the ad pan. There is more information that was put in disregarding how brutal he was in his attacks. And that was just part of the solicitor's strategy in the second trial. Okay. If you say it has to do with size, what are comments like caveman and brute and beast of burden and monster, are they all size-related? The caveman comment was referring to the fact that with at least two of the victims of assaults that were testified to, he had drugged those individuals by the hair, and that was what that was referencing to. The other comments were other comments referencing just how brutal of a person Mr. Bennett was towards others. But he had already been convicted of the crime. What you're talking about is what is the penalty was going to be imposed. And wasn't this made in the context of if he didn't get the death penalty, he could be dangerous if he ever was released? Yes, Your Honor. That was… He'd be like King Kong, a monster, if he ever was released. And he's sitting over there, and he's a big, what did you say, 6'6", 280 pounds, black man. And King Kong is perceived as a gorilla, right? Yes. But again, in resolving the issue, first, it's a matter of it was not unreasonable for the South Carolina Supreme Court to find that the references made by the solicitor to King Kong were referring to the defendant's race. There was only one of three, at least three references. Yes, and it wasn't… It wasn't racial issues during the course of that retrial. Isn't that right? And we have to look at them in their totality, don't we, rather than on an isolated basis? I mean, there might be enough isolated, on an isolated basis, but we look at them cumulatively as well, don't we? We do believe that in looking at the issues. You do look to see if they're, overall, if they were isolated or not. And in this case, we believe all of the comments were isolated. They were never tied to one another. And in looking at the comments… But they all were made during the course of the trial. And the… Same trial, the retrial, just for purposes of punishment. They were all made during the retrial, but again, in looking at the statements that are at issue, first, the statement regarding blonde-headed lady, we submit that does not refer to race at all. That was not asked as a… Which one didn't refer to race? The one where he asked Ron Collins if he could recall a particular guard, and when they were having a discussion about… Blonde woman? Yes. That doesn't specifically refer to race, and that wasn't an attempt by the solicitor to inject race into the proceedings at all. And that was an isolated comment. The comment… The testimony regarding the… From the… One of the prior Appen victims regarding where he's talking about a dream he had while he was in the hospital. The black Indian? Yes. That was not a comment that was intended to interject race into the proceedings. Counsel, can I ask you a question about that? Because I'm just reading it on paper. It sounds like the district court was talking about a concession you made before the district court that that was, you know, just totally unqualified evidence and that you could… The state could not imagine a purpose other than the invoking of racial imagery for the black Indian dream. Did the district court get that wrong? Was that not a concession? That was not the kind of concession that the district court made it out to be. During that argument, I had contended that the statement would have been admissible as some kind of victim impact testimony going to the emotional or psychological injury that was suffered by the victim in that case. Why would the race of the Indian be relevant to the victim impact effect? The race of… You know what I'm saying? I don't understand him. And I guess in looking at that, that's not something that the solicitor asked. He didn't ask what was the race of the Indians. He just asked, did you have any dreams? And… You're not contending he was surprised, are you? Because an elemental rule of cross-examination is you don't ask the question unless you're pretty sure what the answer is going to be. And I'm not contending that he was surprised, but he is not… So he knew when he asked the question of the witness what the response was going to be. I mean, there's good likelihood that he did know what the response may have been, but he is not able to change what a witness's answer is going to be. At a certain point, and you can deal with each of these comments in isolation, but at a certain point it all just gets to be too much, and it's just saturated. The re-sentencing just becomes saturated with inferences. And when you look historically, as Judge King did, and Boya Liberto, and when you look historically at the derogatory references made with respect to African-American citizens, and this has to be taken in that kind of context. And it's just very hard. I don't see that he had to resort to this sort of rhetoric, because in the earlier re-sentencing, it was done in a completely race-neutral fashion. And suddenly, you get an all-white jury, and the whole approach appears to change. And that's, I think that's what concerned the district court. And it's not a good thing if we were to say, well, this is no problem, and we can impose the death sentence here in the face of this sort of reference. Doesn't that give a green light to smuggling in all kinds of racial whistle-calls, as the district court referred to it, down the line? No, Your Honor. And again, we believe that in looking at how our South Carolina Supreme Court ruled on the issue, they took into consideration whether or not the statement was bringing race into the trial, and they determined that in looking at the complete, all the circumstances of the case, looking at the case that was presented by the state, and the case that was presented on the defense, where you have these competing arguments of where the state is presenting evidence that this is a massive, brutal man who is using his size to his advantage at any times in manipulating individuals. Well, if the argument had been in the words that you just uttered to us, it would have been fine, because that would have been a race-neutral argument. But you didn't, you, in what you just said to us, you avoided, rightly, I think, the kind of language that the solicitor used before the jury. You may not have wanted to repeat it. You probably wouldn't. If you'd been trying the case, you wouldn't have done it. Well, that's neither here nor there. Well, it may not be here nor there, but that's a fact. Ultimately, the issue is going to be not to fall this off by what the juror said post-trial, referred to this man as a dumb N-word. Why did he do this? He was just a dumb N-word, right? That is what the juror said. That's what the record is. I will say, first, the two issues were never connected during the post-conviction relief action. And to try to connect the juror's thoughts to what the solicitor was going for, we believe – The magistrate connected them, right? Didn't the magistrate judge, as part of the opinion, connect them up? Did that just come out of nowhere? That was something that the district court definitely did do, was tie the two together. I thought it was the magistrate also. Anyway, it doesn't matter. But ultimately – I mean, how can you really separate them out? Well, there is no testimony presented at the PCR hearing that reflected that. Anything that was said during the trial in terms of those particular comments were – that those had an impact on the juror. Well, it had to be – right. I mean, either the juror went into the proceeding with the views he expressed seven years later or his views were informed by what happened in the sentencing, right? There's only two choices. Do you see what I'm saying? I see what you're saying, and I would just – I thought your argument about the juror was forget whatever was in his head because he paid attention to what happened at the sentencing. That's what influenced his decision-making. But now it seems like you're saying, no, no, he wasn't influenced by what happened at the sentencing. It was all just internal to him. And it seems to me that either way you've got a bit of a problem. No, he – in making his – in looking at the argument that we're presenting, the argument was that the juror was not – his decision was based on the evidence that was presented at trial. Statements by the solicitor, that's not evidence. That's just statements by the solicitor. And we believe that what was not established at the post-conviction relief hearing were that when he used – when he said that the reason that Mr. Bennett committed the murder was because he was just a dumb N-word, we believe that's not reflective or wasn't shown at the PCR hearing that that was reflective of his thoughts at the resentencing proceeding. That was his thought at the time that he was doing this interview in 2007 with PCR counsel. And they didn't sufficiently present – they didn't present sufficient evidence tying those thoughts to his beliefs at the time of the resentencing hearing. We believe that that's borne out by the testimony of the juror. He indicated that he had been thinking about the case pretty much every day from the time, like from the time he was on the jury until the time of that interview. That's on page 1850 of the record. And if you look at the questions that were asked, they don't point to directly that that was his thought process at the sentencing hearing. All right, thank you, Mr. Simon. We appreciate it. You've got some rebuttal. Bob, do you have any more questions? No, I'm fine. Pam, do you have any more questions? May it please the Court. I think the Court's questions of Mr. Simon really got to the nub of what was unreasonable about how the state courts treated the injection of race into this. And the fundamental error was to look at each little teeny component part and not to put it together. If you start, there's really a systematic plan to inject race into this trial. It started during Solicitor Meyer's opening statement when, as Judge Wilkinson noted, he called him brutal, monster-sized, big old brute, total respect for human nature, a big old bear of a fellow. Then during the state's case in chief in aggravation, they repeatedly refer to some adjudicated and unadjudicated bad acts in terms of the race of the people involved. Then he injects the black Indian dream. And, Judge Harris, there was an explicit concession on this in the district court. It's in the joint appendix where the Indians were trying to kill me. Solicitor Meyer clearly knew it was coming. They objected on relevance grounds. He said, I'm going to show you the relevance of this. He knew exactly what this person was going to say. And then they said it, and then it was objected to. Then during the penalty phase, the mitigation phase, they not only can do some more of this, but then he injects the fact that the woman with whom Mr. Bennett had a sexual relationship, a guard, everyone who they were talking about, Judy Hardy, had been discussed throughout this. And he says, yes, the blonde lady. I don't think there's any other way to interpret that other than he wanted the jury to know that Mr. Bennett had a black lover. And then during his penalty phase summation, he refers to the – A white lover, you mean? Pardon me? A white lover. Yes, yes, sorry. And then during his penalty phase summation, he calls him caveman, big old tiger, beast of burden. He repeatedly refers to the relationship with Hardy and then calls him sort of the coup de grace, King Kong. I think the notion that King Kong isn't racial, especially in the context of all this, is preposterous. If I went back to Ithaca de Mara and in my criminal procedure class I had a large black student and I asked him some questions in a Socratic dialogue, and then I turned to another student and said, well, what do you think about what King Kong just said? My office would be cleaned out by the end of the day. And if I looked at my dean and said, I wasn't referring to race, I was just referring to the fact that he was a large guy, they'd laugh in my face. As well, they should, you know, in that. So there was a systematic injection of race and race themes throughout this entire trial. And that's really what the district court focused on in determining that the state court both made unreasonable determinations of fact by saying King Kong's not racial, blonde-headed not racial. But it's an unreasonable – We're not talking about a trial here. We're just talking about the particular resentencing. Correct. That's correct. His conviction is intact. Nothing the district court did. I mean, it just set aside the penalty phase and sent it back for a new sentencing trial. So then that brings us to the issue that Mr. Simon closed on that the court was asking about, and that's whether this juror was biased, Juror Humphreys. And as Judge King indicated, he was asked about this during the post-conviction proceedings. He was asked about this, and he was asked, well, why did you think that Mr. Bennett committed the crime? Here's the question. And why did you think that Mr. Bennett had killed the victim? And the answer is because he was just a dumb in. And then he goes, look, I apologize for saying that, but after going through that thing for an entire week and all the evidence piling up against him, that was just the way I felt about it. He's asking questions about his service as a juror. That's the setup. He's talking about, as I sat there in the trial and heard the evidence, that was how I felt about it. That's clearly going back to his service as a juror. And then on redirect, he's asked again, I was asking you questions. This is how you felt in terms of your characterization of Mr. Bennett at the time of the resentencing. And then he says, you know, I shouldn't have said that, but, you know, to me, he was not a good person for what he did with no remorse, and that's how I felt. He's talking about. We wouldn't need the testimony or the issue of the effect on a particular juror. I mean, what I'm saying is that the language used by the solicitor and the cumulative force of it and the obvious purpose of it would stand on its own. Yes, yes. These are independent claims for relief. And I think this just goes to the fact that this juror was biased. And, you know, the idea that, well, you know, the logic of the State court decision, really their argument is, well, all you proved is he was a racist at the time of the PCR hearing, not at the time of the trial. Well, first of all, I mean, that works on some assumption that he was a completely fair, neutral person. Some extraordinary event happened in his life and turned him into a screaming racist in this period of time. There's absolutely no evidence to suggest that. It's counter to sort of human experience in nature. And it's really not consistent at all with the conversation that was had during the examination. It's all looking really at, you know, the trial itself. And, you know, the notion that this isn't evidence of bias, of racial bias, is really, I think, defies common sense, and it defies what we know about the world. And the district court, he didn't ignore what the State court did. He didn't refuse to defer. He did exactly what the Supreme Court of the United States in Millerell, in other cases, has said. Look, you look at what the State court did. You sort of compare it to the cumulative weight of the evidence, and if it's against the manifest weight of the evidence, it's unreasonable. And that's what the district court did. He did it very carefully. He concluded that the State court decision couldn't, didn't satisfy 2254D-2, an unreasonable determination of the facts, and he granted relief. So he went at it just exactly how he's been instructed to do. I would suggest that the, what level, what are we dealing with here? I want to come back to the question that Judge Harris raised at the very beginning of this. Are we talking about a factual finding here, or are we talking about a legal proposition, or what are we talking about? I think now we're going back to the comments, the argument. Back to the comments. The due process claim, yes. So I think on that, what the district court treated these primarily, the failure to say that King Kong was the injection of race, that the blonde-headed lady was an injection of race, he concluded that those were unreasonable determinations of fact under 2254D-2. He said, look, if you look at the record evidence, you look at all of this stuff together, you put it all together, those were unreasonable determinations of fact under 2254D-2. In our brief, and as we said below, I believe this was also an unreasonable application of Darden and the due process clauses under 2254D-1. It wouldn't be contrary to the court did identify the rule. If we assume arguendo that the factual findings were not erroneous or whatever, then what would follow? Then there would be no due process violation. You have to get at the unreasonable, that it's an unreasonable determination of fact, do you not? Well, I think in this particular case, the way it was briefed and argued, there are two paths home. The district court chose the 2254D-2. He looked at blonde-headed lady. He looked at King Kong. He looked at all these things together and said that the state court, in saying that King Kong didn't refer to a large black gorilla, is ridiculous, especially given sort of the long history in this country of derogatorily referring to African Americans as apes and monkeys. I mean, when pitchfork Ben Tillman went around trying to get the Constitution of 1890— That's getting at the state court fact finding. Pardon me? That's getting at the state court fact finding. Yes, that the King Kong wasn't a reference to race, that blonde-headed lady wasn't a reference to race, that black Indian dreams, he'd treat those. But I think also the way it's been briefed and presented— I mean, but the nub of it is to say that these comments, in isolation or cumulative, had no racial implication is simply an erroneous finding of fact. That's how the district court approached it, yes. Yes, and I'm saying, do you agree with that? I agree it was an unreasonable determination of fact. Or do you think that there's a legal determination here as well that was against clearly established law? Well, I think it's both. I mean, I think it's an unreasonable determination of fact, and that then affects the state court's judgment that this wasn't a due process violation, that it didn't render the trial fundamentally unfair. I think that's unreasonable under Darden primarily because not only because of the factual determinations, but also what the state court didn't do is one of the things that Darden said, and I believe you asked this question when Mr. Simon was up. They never considered these things in their totality. They broke each one up individually and said, well, if you just look at the King Kong, we don't think that refers to a large black ape that goes on a murderous rampage. I think that's wrong in and of itself, of that. But they didn't put this together with all the other comments, which I believe, again, has been suggested by other members of the panel. When you put all of this together, the smell of the injection of race and playing on an all-white jury's racial fears and biases, explicit and implicit, is clear from this. This was a clear message. It was done differently before the all-white jury than in front of the mixed-race jury in that, and there's just no way all of these things together weren't an attempt to inject race. Am I remembering right that the district court also said the district court treated these as fact findings and said these fact findings are unreasonable under AEDPA, and then also said when it comes to prejudice, to the extent the state courts made a prejudice finding, that also was unreasonable as a matter of fact? Treated that as a fact question as well? What should we do with prejudice? Yeah, well, he did do much of this under D2 on that. I think, but this still goes to our other contention that this is just an unreasonable application of Darden, which requires that the trial be fundamentally unfair, and the district court went through it and said, look, all of this evidence of race, this is the penalty phase of a capital trial, a resentencing of a capital trial. The Supreme Court of the United States has recognized in Turner v. Murray and other cases that because of the discretion that a jury has at the penalty phase of a capital trial, there's a unique opportunity for racial bias and prejudice to affect the decision. And given that legal backdrop and given this cornucopia of race-infringed comments, that that was the risk here, that was what rendered this fundamentally unfair in this case. And I think, again, the district court was very careful. He went through the state court's decision, pointed out what he thought was unreasonable about it, and did exactly what this court and the Supreme Court of the United States have encouraged courts to do. Deference doesn't mean abdication. It doesn't mean that a habeas petitioner can never win. And under these circumstances, given the racial issues in that and the fact that this clearly had a racial bias juror that determined Mr. Bennett's fate, the judgment of the district court should be affirmed. So you say that the racially biased juror claim has to be rolled into the first claim, too, and taken into account? No, I don't think it does. You said that. I mean, you said looking at it along with the fact that it was a racially biased juror. Well, I think what I was really trying to say, I'm sorry if I misspoke, that there are two strong independent bases for habeas corpus relief in this case. Right. The district court granted relief on both of them. I mean, I think it does seem apparent that the racist and the injection of race found fertile ground when Juror Humphreys was put on the jury, and this would have played into that. I mean, I think it is. It's just that it was raised as an independent. I mean, part of this, and going into some of the questioning, is this is raised as a juror bias claim. That's how it was raised. It's not necessarily presented as an extraneous influence claim. That gets into all kinds of problems under 606 about what you can ask the juror. But the claim is straightforward. Look, this juror, there's clear evidence of racial bias. A biased juror is a structural error that warrants relief, and the district court properly found that. I mean, I think thematically, yes, in this case they're related, but they're independent bases for relief. That's the way the district court found them. You're also saying that given this language and the repetition of it, you wouldn't necessarily need testimony from a juror as to the effect that it had. Correct. You can look at the language itself, and even without interrogating a juror before a PCR hearing, say, you know, we can take almost judicial notice of the fact that this was an attempt to win a death penalty with a not-so-subtle racial appeal. Yes. I mean, I think, right. You know, the irony of here is sort of how this played out at the PCR hearing. When Juror Humphreys was called as a witness, he acknowledges that he made the comment that he was just a dumb end. He said that's how he felt about it. He admitted using the word on other occasions. He admitted he referred to other African Americans as just, you know, as dumb ends and all that. And then on cross-examination by the state, they asked him a series of questions about his deliberative process, which the PCR counsel objected to. So that's barred by 606, and the judge let in over their objection. But his point was, look, this isn't extraneous influence. This juror, this is clear evidence of bias on behalf of this juror. He was a racially biased juror. He shouldn't have been allowed to sit. That's a structural error. We win. That was the pitch. And then in addition, there's this due process claim. So I think they're independent. Obviously, you know, thematically and how it worked, they're linked because they're both, you know, they're linked. And that's in the narrative sense in that they both had to do with race, but they're independent bases for relief. Because the King Kong statement was made before this particular juror. Yes. That juror who was on that jury. Yes. It was made to him. Thank you. Mr. Simon, you have some time for rebuttal. May it please the Court. First, going back to a question that you had, Judge Harris, about what was the basis for the legal determination regarding the King Kong comment. We would refer to the South Carolina Supreme Court site to State v. Patterson, which contains the language that is in Donnelly. That's on Joint Appendix Site 1772. And in looking at the comments that were made by the solicitor during the trial, the issue is not whether those comments should be condemned. Because they should be, but that's not what, to the extent that they were, to the extent that they reflect on race, they probably, they should be condemned. But it's not a matter of whether comments made by a prosecutor are condemnable or universally condemnable. It's whether or not the defendant received a fair trial. And in this case, the South Carolina Supreme Court found that, in light of the comments made, taking into consideration the context in which the comments were made, the fact that they were isolated comments, it found that those statements, I guess the statement regarding King Kong, the reference to the blonde lady, and the elicitation of those two statements, those two did not render his trial unfair in light of all the evidence and testimony that was presented. And that was a reasonable determination, both of the facts, the factual findings made by the South Carolina Supreme Court are supported by the record, and further, it was a reasonable application of federal law, a reasonable application of Darden and Donnelly. Can I just ask you, as you said, the state courts did say these were isolated comments. I don't understand what they meant by that. I mean, they weren't isolated. This permeated, in what sense, what did the state court mean when it said they're isolated? Like you only, that each phrase was used only once? Is that the idea? I literally don't understand the sense in which they were isolated, but I'm hoping you can explain. First, in reference to the blonde-headed lady comment, that was the only reference at all made throughout the trial that could potentially be the point to the race of Ms. Hardy. But in looking at the reason why the solicitor asked that question, it was not, it was clear that he was not asking to inject race. What he was doing was he was trying to find out if this particular. I understand what the state court meant about the context in which the statement was made. What I don't get is what the state courts meant when they said these are, each one of them, if you take them in an isolated way, then each one is isolated. I don't understand the sense in which you can say three different comments, assuming hypothetically for a minute that each of them does have a racial implication, that they are isolated if they all occurred during the same proceeding. And looking at what they're saying in terms of that they were isolated, they're pointing to the fact that these were three comments that were not tied together and they were not, and looking at the full context of the trial, this, and the length of the trial, these were not, this is not a situation where they were, race was being permeated throughout the trial by these comments. So you think they thought even taking them together, the three of them were sort of isolated from what happened in the rest of the trial? Yes. Is there anywhere where any state court said taking these three comments together, comma, they're isolated? Well, in looking at the South Carolina Supreme Court's ruling on both the King Kong comment and the blonde-headed lady comment, those are both addressed in the same part of the Supreme Court opinion. Now, with the comment about the black Indians, that was dealt with in a completely different manner in the Supreme Court. And just quickly on the juror issue, the finding was based upon, by the PCR court, was based upon the fact that it was unclear if he was referring to 2007 or 2000 when the juror was testifying and he made the reference to the defendant being just a dumb N-word. PCR counsel had the opportunity to present more evidence or get more information out of the juror that would establish that this, he was referring back to 2000. That was not clear based on the way that the testimony laid out in the transcript or at the hearing, and on top of that, the PCR judge had the opportunity to both see the juror testify in person and assess his body language, his demeanor, and determine what, based off of his testimony, both doing a direct cross and redirect, what this juror was referring to and if this juror was credible. And those determinations by the PCR court are entitled to deference, and we believe the district court didn't. Quick question just about the sort of scope of your argument on this juror thing. Am I understanding correctly, just from the way you briefed and argued the case, that assuming hypothetically that the comment did refer to the juror's state of mind and his bias against the defendant at the time of sentencing, you agree that then there would have to be a new sentencing? Yes. If that was properly found to be referring to his thoughts at the resentencing, he would be entitled to resentencing. But based on our briefs and our argument, we just requested this court reverse the district court's order. Thank you. We thank you very much, and we will come down and greet counsel and then proceed to our next case.
judges: J. Harvie Wilkinson III, Robert B. King, Pamela A. Harris